IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

BRIAN D. RHODES,

        Plaintiff,

vs.

CAROLYN W. COLVIN,
Commissioner of Social Security,[1]

        Defendant.

No. C12-0106

RULING ON JUDICIAL REVIEW

## TABLE OF CONTENTS

I.     *INTRODUCTION* ........................................ 2

II.   *PROCEDURAL BACKGROUND* ........................... 2

III.  *PRINCIPLES OF REVIEW* .............................. 3

IV.  *FACTS* ............................................... 5
     A.    *Rhodes' Education and Employment Background* ............. 5
     B.    *Administrative Hearing Testimony* ...................... 5
          1.    *Rhodes' Testimony* ........................... 5
          2.    *Vocational Expert's Testimony* ................... 6
     C.    *Rhodes' Medical Evidence* ........................... 8

V.   *CONCLUSIONS OF LAW* ............................... 11
     A.    *ALJ's Disability Determination* ....................... 11
     B.    *Objections Raised By Claimant* ....................... 14
     C.    *Reversal or Remand* .............................. 20

VI.  *CONCLUSION* ....................................... 21

VII. *ORDER* ............................................ 21

---

[1] Plaintiff originally filed this case against Michael J. Astrue, the Commissioner of Social Security Administration ("SSA"). On February 14, 2013, Carolyn W. Colvin became Commissioner of the SSA. The Court, therefore, substitutes Commissioner Colvin as the Defendant in this action. FED. R. CIV. P. 25(d)(1).

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 3) filed by Plaintiff Brian D. Rhodes on October 17, 2012, requesting judicial review of the Social Security Commissioner's decision to deny his application for Title II disability insurance benefits. Rhodes asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide him disability insurance benefits. In the alternative, Rhodes requests the Court to remand this matter for further proceedings.

## II. PROCEDURAL BACKGROUND

On May 1, 2009, Rhodes applied for disability insurance benefits. In his application, Rhodes alleged an inability to work since October 30, 2006 due to back and leg injuries from a construction accident. Rhodes' application was denied on June 23, 2009. On December 2, 2009, Rhodes' application was denied on reconsideration. On January 26, 2010, Rhodes requested an administrative hearing before an Administrative Law Judge ("ALJ"). On February 24, 2011, Rhodes appeared via video conference with his attorney before ALJ Thomas M. Donahue for an administrative hearing. Rhodes and vocational expert Carma A. Mitchell testified at the hearing. In a decision dated March 15, 2011, the ALJ denied Rhodes' claim. The ALJ determined that Rhodes was not disabled and not entitled to disability insurance benefits because he was functionally capable of performing work that exists in significant numbers in the national economy. Rhodes appealed the ALJ's decision. On September 17, 2012, the Appeals Council denied Rhodes' request for review. Consequently, the ALJ's March 15, 2011 decision was adopted as the Commissioner's final decision.

On October 17, 2012, Rhodes filed this action for judicial review. The Commissioner filed an Answer on January 18, 2013. On February 22, 2013, Rhodes filed a brief arguing that there is no substantial evidence in the record to support the ALJ's

2

finding that he is not disabled and that he is functionally capable of performing work that exists in significant numbers in the national economy. On May 3, 2013, the Commissioner filed a responsive brief arguing that the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. On May 20, 2013, Rhodes filed a reply brief. On March 18, 2013, both parties consented to proceed before a magistrate judge in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

## III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court will "affirm the Commissioner's decision if supported by substantial evidence on the record as a whole." *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) (citation omitted). Substantial evidence is defined as "'less than a preponderance but . . . enough that a reasonable mind would find it adequate to support the conclusion.'" *Id.* (quoting *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010)); *see also Brock v. Astrue*, 674 F.3d 1062, 1063 (8th Cir. 2010) ("Substantial evidence is evidence that a reasonable person might accept as adequate to support a decision but is less than a preponderance.").

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012);

3

*see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (Review of an ALJ's decision "extends beyond examining the record to find substantial evidence in support of the ALJ's decision; [the court must also] consider evidence in the record that fairly detracts from that decision."). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Buckner v. Astrue*, 646 F.3d 549 (8th Cir. 2011), the Eighth Circuit further explained that a court "'will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id.* at 556 (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). "'An ALJ's decision is not outside that zone of choice simply because [a court] might have reached a different conclusion had [the court] been the initial finder of fact.'" *Id.* Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) ("If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently."); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'If there is substantial evidence to support the Commissioner's conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion.' *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).").

## IV. FACTS

### A. Rhodes' Education and Employment Background

Rhodes was born in 1967. He completed the eleventh grade, but did not graduate from high school. He has not earned a GED. At the administrative hearing, Rhodes testified that he had only ever worked as a carpenter.

The record contains a detailed earnings report for Rhodes. The report covers the time period of 1985 to 2010. Rhodes had minimal earnings in 1985 (less than $700.00), and no earnings in 1986. From 1987 to 2007, Rhodes earned between $1,225.00 (2003) and $24,856.00 (2000). He has no earnings since 2008.

### B. Administrative Hearing Testimony

### 1. Rhodes' Testimony

At the administrative hearing, Rhodes' attorney asked Rhodes what happened on October 30, 2006, Rhodes' disability onset date, to cause his disability. Rhodes responded that:

> A: I -- we were flipping a floor over and there was like six of us and it was 14 by 24 foot, we were putting it down and all I heard was somebody say run and I turned around, next thing I know I'm smashed underneath that floor.
>
> Q: So it fell on you?
>
> A: Yes.
>
> Q: Pinned you down?
>
> A: Yeah, everybody -- everybody was picking the corner [] up but I couldn't use my legs because my back -- it messed my back up so I had to crawl out on my elbows to get out.
>
> Q: And after that there was injury to your back?
>
> A: Yes, yes.
>
> Q: Okay and eventually you had surgery right?
>
> A: I had two major surgeries. . . .

(Administrative Record at 40-41.) Rhodes' attorney asked Rhodes to describe any ongoing problems he had with his back. Rhodes replied that he has difficulty sitting for long periods of time and walking long distances due to cramping and back pain. Later, Rhodes had surgery on his left hip for a torn labram.

Rhodes' attorney inquired about Rhodes functioning after his surgeries:

> Q:  So there was a -- how -- the big issue apparently is how did you -- how you were functioning after the surgeries. Were you able to walk without assistance?
>
> A:  No I had to do almost a year and a half of therapy. They had to teach me how to walk again pretty much.
>
> Q:  Okay. And you're using a cane now?
>
> A:  A cane and I have a brace. I'm supposed to be wearing a brace all of the time on my left ankle because it's just -- because the floor landed pretty much on my whole left leg, my whole left side and my leg[ is] still numb. My foot's still numb and my ankle, I have no control over it.
>
> Q:  And that was all a result of that original injury?
>
> A:  Yep.

(Administrative Record at 42-43.) Next, Rhodes' attorney asked Rhodes how long he can be on his feet before needing to rest. Rhodes stated that it depends upon his hip, but generally he needs to switch positions every 10 to 15 minutes, from standing to sitting to laying down. Rhodes testified that laying down provides him the most pain relief.

### 2. Vocational Expert's Testimony

At the hearing, the ALJ provided vocational expert Carma A. Mitchell with a hypothetical for an individual who is capable of:

> Lifting 20 pounds occasionally, ten pounds frequently[.] . . . Sitting and standing up to two hours at a time for six of an eight hour day, walking three blocks, no climbing ladders, ropes and scaffolds. Only occasional climbing of ramps and stairs, only occasional balancing, stooping, kneeling, crouching, crawling and bending, [the individual] would need a low stress job such as a level three with ten being the most

> stressful and one being the least stressful. He would require
> a job with no contact with the general public, limited contact
> with fellow workers.

(Administrative Record at 52.) The vocational expert testified that under such limitations,

Rhodes could not perform his past relevant work. The vocational expert further testified

that Rhodes could perform the following work: (1) marker (2,000 positions in Iowa and

186,000 positions in the nation), (2) inserting machine operator (200 positions in Iowa and

16,000 positions in the nation), and (3) collator operator (500 positions in Iowa and

55,000 positions in the nation). The ALJ asked the vocational expert a second hypothetical

for an individual who:

> can lift ten pounds occasionally, five pounds frequently.
> Sitting up to two hours at a time for at least six of an eight
> hour day, walking two blocks, no climbing ladders, ropes and
> scaffolds. Only occasional climbing of ramps and stairs, only
> occasional balancing, stooping, kneeling, crouching, crawling
> and bending, [the individual] would need a lower stress level
> job such as three with ten being the most stressful and one
> being the least stressful, would require a job with no contact
> with the general public, [and] limited contact with fellow
> workers.

(Administrative Record at 53.) Again, the vocational expert testified that under such

limitations, Rhodes could not perform his past relevant work, but could perform the

following work: (1) document preparer (300 positions in Iowa and 32,000 positions in the

nation), (2) addresser (200 positions in Iowa and 25,000 positions in the nation), and

(3) surveillance systems monitor (200 positions in Iowa and 33,000 positions in the

nation).

Rhodes' attorney also questioned the vocational expert:

> Q:    Ms. Mitchell [if] the hypothetical person needed to take
>       frequent unscheduled rest breaks, two to three per day,
>       15 to 30 minutes at a time, would an employer allow
>       for that?

A: No the person -- the employer would not and the person wouldn't be able to do those jobs or any jobs on a full time competitive basis.

Q: If the hypothetical person had to work at a slow pace, up to a third of the work day, would they be competitively employable?

A: No, they wouldn't be able to maintain full time competitive employment.

Q: Okay and with regard to either the -- either the one or two hypothetical if the person needed to frequently change positions as much 15 -- every 15 minutes from sitting, standing, to lying down, would an employer allow for that?

A: No it's been my experience that even a person alternating every 15 minutes sitting and standing and walking, even without the lying down that it's too much . . . and they wouldn't be able to maintain full time competitive employment.

(Administrative Record at 54.)

### C. Rhodes' Medical Evidence

On October 30, 2006, Rhodes was in a workplace accident where a wall fell on him injuring his back.[2] An MRI showed an L5-S1 protrusion. On November 1, 2006, Rhodes underwent a left L5-S1 laminotomy and microdiscectomy. The next day, on November 2, Rhodes underwent a second back surgery due to post-operative complications brought on by ambulation. Rhodes was discharged from the hospital on November 5, 2006. At a follow-up appointment in December 2006, Rhodes reported little back pain, but burning pain in his feet. By February 2007, Rhodes was doing well in physical therapy and had regained some strength in his left foot, but continued to have difficulty walking due to tenderness on the bottom part of his foot.

---

[2] In his testimony at the administrative hearing, Rhodes referred to a floor falling on his back. The medical records, however, refer to a wall falling on him.

At a follow-up visit in November 2007, Rhodes complained about left hip pain. Specifically, Rhodes reported that his hip "bothers him most when he is standing up putting weight on it."[3] In December 2007, Rhodes met with Dr. Sunny R. Kim, M.D., complaining of low back pain with left hip pain. Dr. Kim noted that:

> [Rhodes is p]rimarily complaining of functional debility. He has been through work hardening but he states he can hardly do any of the things that he has been challenged with. He has difficulty with lifting, walking. His pain is rated 4 to 5/10 at present[.] . . . Pain is worse in the morning, afternoon, and evening hours. Pain is better with medications, exercise, and massage. Pain is aggravated by sitting, standing, walking, putting on shoes, coughing, and bending forward.

(Administrative Record at 298.) Upon examination, Dr. Kim diagnosed Rhodes with "functional deficits including a left footdrop and weakness which appears to be gradually improving. The symptoms around the left hip girdle muscles is likely reactive muscle spasm from the radiculopathy."[4] Dr. Kim recommended medications and physical therapy as treatment.

At a follow-up visit in July 2008, Rhodes reported "some" back pain and residual left foot numbness, tingling, weakness, and cramping. In February 2009, Rhodes continued to complain of left hip pain and numbness and tingling in his left ankle. Rhodes was referred to physical therapy for treatment.

On June 2, 2009, Dr. Scott Shafer, Ph.D., reviewed Rhodes' medical records and provided Disability Determination Services ("DDS") with a psychiatric review technique assessment for Rhodes. Dr. Shafer diagnosed Rhodes with substance induced mood disorder, generalized anxiety disorder, and alcohol dependence. Dr. Shafer determined that Rhodes had the following limitations: mild restriction of activities of daily living,

---

[3] Administrative Record at 376.

[4] Administrative Record at 299.

mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. Dr. Shafer concluded that "[a]ll evidence considered, [Rhodes] does not have a severe mental impairment that limits his function."[5]

On June 22, 2009, Dr. Gary Cromer, M.D., reviewed Rhodes' medical records and provided DDS with a physical residual functional capacity ("RFC") assessment for Rhodes. Dr. Cromer determined that Rhodes could: (1) occasionally lift and/or carry 20 pounds, (2) frequently lift and/or carry 10 pounds, (3) stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday, (4) sit with normal breaks for a total of about six hours in an eight-hour workday, and (5) push and/or pull without limitations. Dr. Cromer also found that Rhodes could occasionally climb stairs and ramps, balance, stoop, kneel, crouch, and crawl, but never climb ladders, ropes, or scaffolds. Dr. Cromer found no manipulative, visual, communicative, or environmental limitations. Dr. Cromer concluded that "[e]vidence documents severe medically determinable impairments with [history of] L5-S1 disc excision with . . . mild residual weakness at the left ankle. These impairments don't meet or equal any reference listings. . . . No opinion evidence expressing specific functional limitations is noted. An RFC has been completed."[6]

On September 11, 2009, Rhodes was referred to the Mayo Clinic for left hip pain. Dr. P.B. Taylor, M.D., noted that:

> [Rhodes'] left hip discomfort today is primarily groin related. This he notes with any turning or twisting type motions. He notes a very sharp pain when this does occur, but he also describes an achy discomfort with prolonged sitting. He will describe a little catch or a type of pop, which he can reproduce himself with hyperflexion and some internal rotation.

---

[5] *Id.* at 454.

[6] Administrative Record at 441.

(Administrative Record at 476.) Upon examination, Dr. Taylor diagnosed Rhodes with left hip pain. Dr. Taylor recommended multiple surgical options as treatment. In October 2009, Rhodes underwent arthroscopic hip surgery.

On December 1, 2009, Dr. Mary Greenfield, M.D., reviewed Rhodes' medical records and provided DDS with a physical RFC assessment for Rhodes. Dr. Greenfield determined that Rhodes could: (1) occasionally lift and/or carry 20 pounds, (2) frequently lift and/or carry 10 pounds, (3) stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday, (4) sit with normal breaks for a total of about six hours in an eight-hour workday, and (5) push and/or pull without limitations. Dr. Greenfield also found that Rhodes could occasionally climb stairs and ramps, balance, stoop, kneel, crouch, and crawl, but never climb ladders, ropes, or scaffolds. Dr. Greenfield found no manipulative, visual, communicative, or environmental limitations. Dr. Greenfield noted that:

> On 10-14-09 [Rhodes] underwent arthroscopic partial labral excision and femoral neck osteoplasty. At follow up 10-29-09 [Rhodes] had discontinued use of crutches and [was] walking without antalgic gait but did report pain with weightbearing and twisting though improvement was continuing. [Rhodes] has also sought care for right facial pain and has been diagnosed with right trigeminal neuralgia. He has responded to treatment with Tegretol and Dilantin in the ER and has been started on Tegretol and Gabapentin for control. [Rhodes] was capable of the RFC provided from the [alleged onset date] until 10-13-09 and will be again by 10-14-10.

(Administrative Record at 551-52.)

In September 2011, X-rays were taken of Rhodes' left hip. The X-rays showed grade 3 osteoarthritis of the left hip joint. Dr. Nicolas O. Noiseux, M.D., recommended hip replacement surgery as treatment. On October 21, 2011, Rhodes underwent total left hip replacement surgery.

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Rhodes is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. § 404.1520(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007). The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger*, 390 F.3d at 590); *Perks*, 687 F.3d at 1091-92 (discussing the five-step sequential evaluation process); *Medhaug v. Astrue*, 578 F.3d 805, 813-14 (8th Cir. 2009) (same); *see also* 20 C.F.R. § 404.1520(a)-(g). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In considering the steps in the five-step process, the ALJ:

> first determines if the claimant engaged in substantial gainful activity. If so, the claimant is not disabled. Second, the ALJ determines whether the claimant has a severe medical impairment that has lasted, or is expected to last, at least 12 months. Third, the ALJ considers the severity of the impairment, specifically whether it meets or equals one of the listed impairments. If the ALJ finds a severe impairment that meets the duration requirement, and meets or equals a listed impairment, then the claimant is disabled. However, the

> fourth step asks whether the claimant has the residual
> functional capacity to do past relevant work. If so, the
> claimant is not disabled. Fifth, the ALJ determines whether
> the claimant can perform other jobs in the economy. If so, the
> claimant is not disabled.

*Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010). At the fourth step, the claimant "bears the burden of demonstrating an inability to return to [his] or her past relevant work." *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (citing *Steed v. Astrue*, 524 F.3d 872, 875 n.3 (8th Cir. 2008)). If the claimant meets this burden, the burden shifts to the Commissioner at step five to demonstrate that "given [the claimant's] RFC [(residual functional capacity)], age, education, and work experience, there [are] a significant number of other jobs in the national economy that [the claimant] could perform." *Brock*, 674 F.3d at 1064 (citing *Ellis v. Barnhart*, 392 F.3d 988, 993 (8th Cir. 2005)). The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. § 404.1545. The ALJ bears the responsibility for determining "'a claimant's RFC based on all the relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Boettcher v. Astrue*, 652 F.3d 860, 867 (8th Cir. 2011) (quoting *Moore*, 572 F.3d at 523); 20 C.F.R. § 404.1545.

The ALJ applied the first step of the analysis and determined that Rhodes had not engaged in substantial gainful activity since October 30, 2006. At the second step, the ALJ concluded from the medical evidence that Rhodes had the following severe impairments: acquired spondylosis status-post L5-S1 fusion with residual left lower extremity weakness and decreased sensation, mild osteoarthritis of the left hip status-post labral excision and femoral neck osteoplasty, trigeminal neuralgia, major depression, generalized anxiety and polysubstance abuse and dependence, and history of attention deficit disorder. At the third step, the ALJ found that Rhodes did not have an impairment

or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ determined Rhodes' RFC as follows:

> [Rhodes] has the residual functional capacity to perform light work . . . such that he could lift 20 pounds occasionally and 10 pounds frequently; sit and stand up to 2 hours at a time for a total of 6 hours in an 8-hour workday; walk up to 3 blocks; occasionally climb ramps and stairs but never climb ladders, ropes or scaffolds; occasionally balance, stoop, kneel, crouch, crawl, and bend. The work would be a low stress level, quantified as a level 3 on a scale of 1 to 10 with 1 being the least stressful and 10 being the most stressful. In addition, the job would require no contact with general public and limited contact with fellow workers.

(Administrative Record at 23.) Also at the fourth step, the ALJ determined that Rhodes could not perform any of his past relevant work. At the fifth step, the ALJ determined that based on his age, education, previous work experience, and RFC, Rhodes could work at jobs that exist in significant numbers in the national economy. Therefore, the ALJ concluded that Rhodes was not disabled.

### B. Objections Raised By Claimant

Rhodes argues that he is presumptively disabled because he meets or equals the requirements of Listing § 1.03. Specifically, Rhodes asserts that he meets the Listing requirements because he: (1) had reconstructive surgery on his left hip, and (2) he cannot effectively ambulate due to his hip impairment. Moreover, Rhodes points out that "[t]he ALJ failed to make any specific findings regarding Listing § 1.03 and failed to even mention Listing § 1.03."[7] Rhodes concludes that this matter should be remanded so that the ALJ can determine whether his hip impairment meets or equals Listing § 1.03. In a similar vein, Rhodes argues that the ALJ failed to fully and fairly develop the record with regard to his impairments. Rhodes maintains that the ALJ should have ordered a

---

[7] Rhodes' Brief (docket number 9) at 14.

consultative examination or obtained medical expert testimony in order to have a complete and full understanding of his medical impairments and functional abilities.

When an ALJ determines that a claimant is not disabled, he or she concludes that the claimant retains the residual functional capacity to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Beckley*, 152 F.3d at 1059. The ALJ is responsible for assessing a claimant's RFC, and his or her assessment must be based on all of the relevant evidence. *Guilliams*, 393 F.3d at 803; *see also Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (same). Relevant evidence for determining a claimant's RFC includes "'medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006) (quoting *Strongson*, 361 F.3d at 1070). While an ALJ must consider all of the relevant evidence when determining a claimant's RFC, "the RFC is ultimately a medical question that must find at least some support in the medical evidence of record." *Casey*, 503 F.3d at 697(citing *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004)).

An ALJ also has a duty to develop the record fully and fairly. *Cox*, 495 F.3d at 618; *Sneed v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004); *Wilcutts v. Apfel*, 143 F.3d 1134, 1137 (8th Cir. 1998). Because an administrative hearing is a non-adversarial proceeding, the ALJ must develop the record fully and fairly in order that "'deserving claimants who apply for benefits receive justice.'" *Wilcutts*, 143 F.3d at 1138 (quoting *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994)); *see also Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006) ("A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record."). "There is no bright line rule indicating when the Commissioner has or has not adequately developed the record; rather, such an

assessment is made on a case-by-case basis." *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008) (citation omitted).

Furthermore, an ALJ may order medical examinations and tests when the medical records presented to him or her constitute insufficient medical evidence to determine whether the claimant is disabled. *Barrett v. Shalala*, 38 F.3d 1019, 1023 (8th Cir. 1994) (citation omitted); *see also* 20 C.F.R. § 404.1519a(a)(1) ("The decision to purchase a consultative examination . . . will be made after we have given full consideration to whether the additional information needed is readily available from the records of your medical sources."). 20 C.F.R. § 404.1519a(b) provides that "[a] consultative examination may be purchased when the evidence as a whole, both medical and nonmedical, is not sufficient to support a decision on . . . [the] claim." *Id*. For example, a consultative examination should be purchased when "[t]he additional evidence needed is not contained in the records of your medical sources." 20 C.F.R. § 404.1519a(b)(1).

Lastly, Listing § 1.03 provides a finding of disability under the following circumstances:

> *Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint*, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months.

20 C.F.R., Pt. 404, Subpt. P, App. 1, Listing § 1.03. Listing § 1.00B.2.b(2) provides that:

> *To ambulate effectively*, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public

> transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R., Pt. 404, Subpt. P, App. 1, Listing § 1.00B.2.b(2).

Here, Rhodes underwent arthroscopic hip surgery in 2009, and had total left hip replacement surgery in 2011. With regard to ambulating effectively, the record demonstrates that following his first hip surgery in 2009, Rhodes: (1) reported hip pain rated at 5 on a scale of 1 to 10 with 10 being the most severe pain in March 2010[8]; (2) was diagnosed with chronic hip pain, including walking difficulties in December 2010[9]; (3) underwent a steroid injection in his left hip for chronic pain in May 2011[10]; (4) had x-rays in September 2011 that showed osteoarthritis of the left hip joint[11]; and (5) underwent total left hip replacement surgery in October 2011.[12] Additionally, Rhodes' mother and father wrote a letter to the ALJ in February 2011 discussing their son's impairments. In particular, Rhodes' parents noted that Rhodes:

> can not sit, stand or walk, [and] only [for] short periods of time. He can not walk on flat ground. . . . [Rhodes] used to go mushroom hunting in the spring and he can no longer do this as he can not walk that long or walk on uneven ground. . . .

---

[8] *See* Administrative Record at 592.

[9] *Id.* at 658-662.

[10] *Id.* at 693.

[11] *Id.* at 701.

[12] *Id.* at 726-730.

> [Rhodes] is not able to grocery shop by himself. As walking
> in the grocery store is too much. . . .
>
> This accident has caused so much pain for [Rhodes]. So many
> things he will never be able to enjoy again. He will never go
> fishing again, mushroom hunting, dancing, walks, playing
> with his nieces and nephew, traveling.

(Administrative Record at 268.)

The Court notes that some of the record regarding Rhodes' hip problems is taken from medical treatment that occurred after the ALJ's decision. These records, however, were presented to the Appeals Council. In its decision, the Appeals Council stated that it considered the new evidence provided by Rhodes, and found that it did not "provide a basis for changing" the ALJ's decision.[13] When a reviewing federal court is confronted with new evidence provided to the Appeals Council, the Eighth Circuit Court of Appeals directs the reviewing court to consider the new evidence as part of the administrative record. In *Cunningham v. Apfel*, 222 F.3d 496, 500 (8th Cir. 2000), the Eighth Circuit explained that:

> The regulations provide that the Appeals Council must
> evaluate the entire record, including any new and material
> evidence that relates to the period before the date of the ALJ's
> decision. *See* 20 C.F.R. § 404.970(b). The newly submitted
> evidence thus becomes part of the 'administrative record,'
> even though the evidence was not originally included in the
> ALJ's record. *See Nelson v. Sullivan*, 966 F.2d 363, 366 (8th
> Cir. 1992). If the Appeals Council finds that the ALJ's
> actions, findings, or conclusions are contrary to the weight of
> the evidence, including the new evidence, it will review the
> case. *See* 20 C.F.R. § 404.970(b). Here, the Appeals
> Council denied review, finding that the new evidence was
> either not material or did not detract from the ALJ's
> conclusion. In these circumstances we do not evaluate the

---

[13] Administrative Record at 1.

> Appeals Council's decision to deny review, but rather we
> determine whether the record as a whole, including the new
> evidence, supports the ALJ's determination. *See Nelson*, 966
> F.2d at 366.

*Id.*; *see also Van Vickle v. Astrue*, 539 F.3d 825, 828 (8th Cir. 2008) (The final decision
of the Commissioner should be affirmed if the decision "is supported by substantial
evidence on the record as a whole, including the new evidence that was considered by the
Appeals Council."); *Nelson*, 966 F.2d at 366 ("The newly submitted evidence is to become
part of what we will loosely describe as the 'administrative record,' even though the
evidence was not originally included in the ALJ's record. . . . If, as here, the Appeals
council considers the new evidence but declines to review the case, we review the ALJ's
decision and determine whether there is substantial evidence in the administrative record,
which now includes the new evidence, to support the ALJ's decision."). In *Riley v.
Shalala*, 18 F.3d 619 (8th Cir. 1994), the Eighth Circuit noted that a reviewing court:

> must speculate to some extent on how the administrative law
> judge would have weighed the newly submitted reports if they
> had been available for the original hearing. We consider this
> to be a peculiar task for a reviewing court.

*Id.* at 622.

The ALJ's decision provides a lengthy and thorough discussion of the relevant
medical evidence in this case through 2009, including Rhodes' first hip surgery. However,
except for Rhodes' immediate follow-up appointment after his first hip surgery, the ALJ
offers little discussion of Rhodes' continued hip pain and treatment in 2010 and 2011,
which ultimately led to total left hip replacement surgery. While some of this evidence
was not available to the ALJ because treatment occurred after the ALJ's decision, some
of the evidence *was* available to the ALJ and occurred prior to the ALJ's decision. For
example, in March 2010, Rhodes reported to his physician that he suffered from hip pain

which he rated at 5 on a scale of 1 to 10.[14] In December 2010, Rhodes complained of pain and walking difficulties at an appointment, and the doctor diagnosed Rhodes with chronic hip pain.[15] Additionally, the Court believes that it is pertinent that the record lacks any opinions from either examining or non-examining physicians as to Rhodes' functional abilities after December 2009. Furthermore, the ALJ fails to address or discuss a letter provided by Rhodes' parents in February 2011, prior to the ALJ's decision, detailing Rhodes' difficulties with standing and walking due to his hip and back pain. Lastly, and most significantly, at no point in his decision does the ALJ address Listing § 1.03, and he offers no discussion of whether it is applicable to Rhodes. Given his hip surgeries, the Court believes that Listing § 1.03 is pertinent to a disability determination for Rhodes.

Under such circumstances, the Court concludes that the ALJ failed to fully and fairly develop the record in this matter. *See Cox*, 495 F.3d at 618. Accordingly, the Court determines that remand is necessary. In particular, the ALJ should further develop the record and more fully discuss Rhodes' medical records after 2009, including the new evidence provided the Appeals Council after the ALJ's decision.[16] The Court further finds that because the ALJ primarily relied on medical opinions which pre-dated 2010, the ALJ should order a new consultative examination of Rhodes as to his physical impairments, including his functional abilities. *See Barrett v. Shalala*, 38 F.3d 1019, 1023 (8th Cir. 1994) (medical examinations and tests may be ordered when the medical records presented

---

[14] Administrative Record at 592.

[15] *Id*. at 658-662.

[16] Because the Court determined that this case should be remanded for further consideration, the Court will not "speculate . . . on how the administrative law judge would have weighed the newly submitted reports if they had been available for the original hearing," *Riley*, 18 F.3d at 622; instead, the Court will allow the ALJ, on remand, to consider the new medical evidence for himself.

to the ALJ constitute insufficient medical evidence to determine whether the claimant is disabled). The ALJ should also address the February 2011 letter provided by Rhodes' parents which discusses Rhodes' difficulties with walking following his back and first hip surgeries. *See Willcockson v. Astrue*, 540 F.3d 878, 880-81 (8th Cir. 2008) (providing that an ALJ may not ignore the statements of other parties regarding a claimant's condition). Lastly, on remand, the ALJ must fully and fairly develop the record with regard to the post-2009 medical evidence dealing with Rhodes' hip pain and second hip surgery, including whether Rhodes' impairments are medically equivalent to Listing § 1.03.

### C. Reversal or Remand

The scope of review of the Commissioner's final decision is set forth in 42 U.S.C. § 405(g) which provides in pertinent part:

> The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with our without remanding the cause for a rehearing.

42 U.S.C. § 405(g). The Eighth Circuit Court of Appeals has stated that:

> Where the total record is overwhelmingly in support of a finding of disability and the claimant has demonstrated his [or her] disability by medical evidence on the record as a whole, we find no need to remand.

*Gavin v. Heckler*, 811 F.2d 1195, 1201 (8th Cir. 1987); *see also Beeler v. Brown*, 833 F.2d 124, 127 (8th Cir. 1987) (finding reversal of denial of benefits was proper where "the total record overwhelmingly supports a finding of disability"); *Stephens v. Sec'y of Health, Educ., & Welfare*, 603 F.2d 36, 42 (8th Cir. 1979) (explaining that reversal of denial of benefits is justified where no substantial evidence exists to support a finding that the claimant is not disabled). In the present case, the Court concludes that the medical records as a whole do not "overwhelmingly support a finding of disability." *Beeler*,

833 F.2d at 127. Instead, the ALJ simply failed to: (1) fully and fairly develop the record with regard to the post-2009 medical evidence and witness evidence from Rhodes' parents, particularly as it relates to Rhodes' hip pain and difficulties with walking; and (2) fully and fairly develop the record with regard to whether Rhodes' impairments meet or are medically equivalent to Listing § 1.03. Accordingly, the Court finds that remand is appropriate.

## *VI. CONCLUSION*

The Court concludes that this matter should be remanded to the Commissioner for further proceedings. On remand, the ALJ must fully and fairly develop the record with regard to the post-2009 medical evidence and witness evidence from Rhodes' parents, particularly as it relates to Rhodes' hip pain and difficulties with walking. The ALJ should also order a new consultative examination of Rhodes regarding his physical impairments, including his functional abilities. Finally, the ALJ shall fully and fairly develop the record and address whether Rhodes' impairments meet or are medically equivalent to Listing § 1.03.

## *VII. ORDER*

For the foregoing reasons, it is hereby **ORDERED**:

This matter is **REVERSED** and **REMANDED** to the Commissioner of Social Security pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings as discussed herein.

DATED this ⟨22nd⟩ day of August, 2013.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA